IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIET NJERU,<br><br>                    Plaintiff,<br><br>-against-<br><br>AON SERVICE CORPORATION, and<br>AON ADVANTAGE FUNDS, LLC,<br><br>                    Defendants. | Case No. 25 Civ. 624 |

## COMPLAINT

Plaintiff Juliet Njeru, by and through her attorneys, Kessler Matura, P.C., complaining of Defendants Aon Service Corporation and Aon Advantage Funds, LLC, (together "Aon" or "Defendants") alleges as follows:

### INTRODUCTION

1. Plaintiff Juliet Njeru ("Plaintiff" or "Ms. Njeru"), brings this action against Aon for discrimination based on race and gender in violation of federal, state, and local law.

2. Defendants Aon Service Corporation and Aon Advantage Funds LLC are subsidiaries of Aon plc.

3. Aon plc is a professional services and management consulting firm with over 50,000 employees.

4. Aon offers, among other risk management services, evaluation and development of Diversity, Equity, Inclusion and Belonging ("DEIB") programs for its clients.[1]

---

[1] https://www.aon.com/en/capabilities/talent-and-rewards/diversity-equity-inclusion-and-belonging-deib-in-the-workplace (last accessed, Jan. 2, 2025).

5. Aon advises current and potential clients to retain Aon to conduct DEIB audits and purports to teach clients how to attract and retain diverse talent and eliminate bias in the hiring and retention process.

6. Ms. Njeru, a 41-year-old Black woman with exceptional qualifications including an MBA degree and CFA Charterholder designation, joined Aon as a Product Manager on April 26, 2021, bringing valuable expertise to the Aon Advantage Funds team.

7. Throughout her employment, Ms. Njeru demonstrated exemplary performance in her role, managing critical responsibilities including investor reporting, capital calls, and fund expenses.

8. Ms. Njeru's excellence was recognized through stellar performance reviews and substantial performance-based compensation, including a performance bonus equal to 31% of her salary and 4.8% base salary increase in March 2023.

9. For over a year Aon subjected Ms. Njeru to flagrant and public race and gender discrimination: Aon used Ms. Njeru's name and image to falsely represent that she was Vice President of Portfolio Strategy for Aon Advantage Funds.

10. Aon showcased this false information in presentations to current and future clients while explicitly denying Ms. Njeru a promotion to the position.

11. Aon exploited Ms. Njeru's image as a Black woman to portray false diversity in leadership. However, Aon refused to promote Ms. Njeru. Instead, Aon forced Ms. Njeru into the humiliating position of repeatedly having to explain to her colleagues that despite Aon's portrayal in its marketing materials, she had not been promoted to Vice President and did not have the authority nor compensation of a Vice President.

12. All Aon Advantage Funds employees who actually occupied the vice president level at Aon Advantage Funds were white and male. Aside from Ms. Njeru, all Aon Advantage Fund employees depicted on Aon Advantage Funds' marketing materials as Vice President were in fact employees at the vice president level who held themselves out as top-level executives at the vice president level in their business communications.

13. On December 14, 2023, Aon Advantage Funds Chief Operating Officer, David Zaccaria, disclosed to Ms. Njeru that he and Aon Advantage Funds Managing Partner Matthew Farrar had been directed to select six people to terminate from the team.

14. Zaccaria further disclosed, without solicitation, that Ms. Njeru's job was safe because the function of her job was "essential" and that she was "part of the squad." Zaccaria's depiction of Ms. Njeru's duties as essential was accurate.

15. Despite Zaccaria's comments, on January 9, 2024, Farrar terminated Ms. Njeru, effective January 26, 2024.

16. Ms. Njeru's termination was suspicious because Zaccaria emphasized, only three weeks earlier, that he had to eliminate six positions but that Ms. Njeru's job was secure because it was essential to running the business. Moreover, Aon was not able to provide a consistent rationale for Ms. Njeru's termination.

17. Ms. Njeru's termination was part of a broader pattern of Aon's discrimination, as five out of the six Aon Advantage Fund employees selected for termination were people of color, and both female team members were terminated, leaving a team predominantly composed of white males.

18. Following Ms. Njeru's termination, her essential duties were reassigned to Zaccaria, demonstrating that her position remained necessary for Aon's operations and that her termination was pretextual.

19. Aon's race and gender discrimination demeaned Ms. Njeru as an employee and demonstrates bias that runs through Aon's diversity consulting practice. Aon instrumentalized Ms. Njeru's race and gender to appeal to investors.

20. Constructing a racially and gender diverse façade is in direct contradiction to the purported core tenets of the diversity consulting expertise that Aon is selling to businesses across the globe and subjects non-white and female employees to discriminatory treatment to (falsely) portray a company's commitment to diversity.

21. Contrary to the exacting and robust DEIB methodology Aon peddles, Aon treated Ms. Njeru as a token Black woman, misrepresenting her position and authority to outside investors in a ploy to bolster its upper management diversity optics.

22. Through this action, Ms. Njeru seeks to recover damages including but not limited to, backpay, front pay, unpaid bonus compensation, emotional distress damages, and compensation for her unvested interest in the Aon IP Advantage Fund Carry Pool, as well as to hold Defendants accountable for their discriminatory practices and prevent similar conduct in the future.

## NATURE OF CLAIMS

23. This action arises under 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq*. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq*. ("NYCHRL").

24. Defendants discriminated against Plaintiff because of her race in violation of Section 1981, and discriminated against Plaintiff because of her race and sex in violation of the

NYSHRL and NYCHRL, by, inter alia, exploiting her image as a Black woman to falsely portray diversity in leadership while denying her actual advancement opportunities, subjecting her to disparate treatment, and ultimately terminating her employment while retaining similarly situated white male employees.

## JURISDICTION AND VENUE

25. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.

26. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

27. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District, and because Defendants conduct business in this District. Defendants maintain offices in this District where Plaintiff was employed, and the discriminatory conduct alleged herein occurred within this District.

## PARTIES

**Juliet Njeru**

28. Plaintiff Juliet Njeru is a 41-year-old Black woman and former employee of Defendants.

29. Defendants employed Ms. Njeru as a Product Manager from April 26, 2021, until her termination on January 26, 2024.

30. At all relevant times, Ms. Njeru was an "employee" under all applicable statutes.

**Defendant Aon Service Corporation**

31. Defendant Aon Service Corporation is a corporation organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

32. Aon Service Corporation is a subsidiary of Aon plc.

33. At all relevant times, Aon Service Corporation was an "employer" under all applicable statutes and was a "non-governmental" entity under 42 U.S.C § 1981(c).

**Defendant Aon Advantage Funds LLC**

34. Defendant Aon Advantage Funds LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 1 Liberty Plaza, New York, New York.

35. Aon Advantage Funds LLC is a subsidiary of Aon plc.

36. At all relevant times, Aon Advantage Fund LLC was an "employer" under all applicable statutes and was a "non-governmental" entity under 42 U.S.C § 1981(c).

**FACTS**

37. Ms. Njeru is a 41-year-old Black woman with exceptional qualifications, including an MBA degree and CFA Charterholder designation.

38. On April 26, 2021, Ms. Njeru joined Aon as a Product Manager on the Aon Advantage Funds team, working from Aon Advantage Fund's New York City office and bringing valuable expertise to the organization.

39. As Product Manager, Ms. Njeru was responsible for critical functions including, but not limited to:

>    a. Investor Reporting: as per the Aon Advantage Fund's Limited Partnership Agreement, Aon Advantage Funds is obligated to report quarterly/annually and meet a specific timeline. These reports included compilation and delivery of financial statements, investor statements and tax schedules to investors;

6

  b.  Capital Calls & Investor Distributions: ensuring accurate calculations, keeping the process on schedule to meet required timelines and performing money movements call backs;

  c.  Fund Expenses: all bank account activity and money movements;

  d.  Requests from Investors' Auditors: responsible for providing information and documentation required for investors' audit processes;

  e.  Lenders' license: maintenance, reporting, filing requirements, quarterly, annually.

40. In addition to the duties that were within her exclusive purview, Ms. Njeru was the lead on the following essential duties:

  a.  Annual Audit: handled 80% of audit deliverables and was the lead contact for annual audit with external auditors;

  b.  Tax Filings, Payments and Reporting: worked closely with internal Aon tax team and external tax advisors;

  c.  Compliance Filings: assisting external compliance advisors; and

  d.  Investor queries: relating to financial statements and tax matters.

41. Throughout her employment, Ms. Njeru consistently demonstrated exemplary performance in her role, receiving stellar performance reviews and earning substantial performance-based compensation.

42. In the second half of 2022 Ms. Njeru first saw her promotion to Aon Vice President of Portfolio Strategy on Aon's marketing materials.

43. At that time, Ms. Njeru was pleased to see her role listed as Vice President of Portfolio Strategy on Aon's marketing materials because she believed that it was an announcement of an authentic promotion that Defendants had awarded her recognizing her exceptional job performance.

44. Aon's release of the material depicting Ms. Njeru's Vice President position preceded the time-period when promotions were typically announced.

45. On March 6, 2023, during Ms. Njeru's 2022 annual review with Aon's Managing Partner Matthew Farrar, Ms. Njeru received a performance-based bonus equal to 31% of her salary and a 4.8% raise in her base salary, along with a glowing review.

46. At the close of her positive review with Farrar, Ms. Njeru asked Farrar if the change of her role from Product Manager to Vice President of Portfolio Strategy in external facing materials meant that she had been promoted to Vice President.

47. Farrar responded that Aon had not promoted Ms. Njeru.

48. Ms. Njeru responded that based on her outstanding performance review and significant performance bonus the promotion was warranted.

49. Farrar reiterated that Ms. Njeru was not receiving a promotion to Vice President.

50. Despite explicitly telling Ms. Njeru that Aon had not promoted her to Vice President, Defendants continued to deliberately misrepresent Ms. Njeru's position at Aon by depicting her as a Vice President in marketing materials.

51. Defendants' false marketing materials included Ms. Njeru's photograph, name and false title of Vice President of Portfolio Strategy.

52. These materials were used in presentations with an audience of current and future investors, clients and colleagues.

53. Aon's misrepresentation of Ms. Njeru's promotion to Vice President continued for over a year, during which time Defendants refused to promote Ms. Njeru and instead exploited Ms. Njeru's image as a Black woman to portray false diversity in leadership.

54. The false representation of Ms. Njeru's position forced her into the humiliating position of having to repeatedly explain to colleagues and others that she did not actually hold the Vice President title that Defendants had publicly attributed to her.

55. However, Ms. Njeru's white male colleagues exercised the authority and position in the Aon hierarchy that was attributed to them in presentations to current and future investors, clients and colleagues.

56. Ms. Njeru's white male colleagues were not required to engage in the same degrading exercise as Ms. Njeru, where she was obligated to explain to colleagues and others how she did not actually hold the Vice President position that Aon was portraying in its materials.

57. Aon's misrepresentation of Ms. Njeru's position was particularly egregious as it demonstrated Defendants' willingness to use Ms. Njeru's race and gender for marketing purposes while simultaneously denying her the actual advancement opportunities they falsely claimed she had received.

58. Throughout the time that Aon was misrepresenting her position in presentations, Ms. Njeru continued to perform her role at a high level and exceed expectations.

59. On December 14, 2023, Aon Advantage Funds Chief Operating Officer, David Zaccaria, called Ms. Njeru and disclosed to her that he and Farrar had to terminate six people from the team of 18.

60. Zaccaria further disclosed, without solicitation, that Ms. Njeru's job was safe because the function of her job was "essential" and that she was "part of the squad."

61. Despite these assurances, less than one month later, on January 9, 2024, Farrar terminated Ms. Njeru's employment.

62. On January 9, 2024, Ms. Njeru met with Farrar.

63. During the meeting, Farrar advised that Aon was eliminating Ms. Njeru's position and terminating her employment, effective January 26, 2024.

64. During the termination meeting, Farrar praised Ms. Njeru's excellent job performance emphasizing that the termination decision was not performance related.

65. Ms. Njeru asked Farrar about the criteria Aon applied in selecting team members for termination. In response, Farrar made a vague statement indicating that remaining team members were selected for "portfolio maintenance" reasons.

66. However, Farrar's explanation was obvious pretext and one dimensional with regards to the Portfolio Management Team.

67. Operational portfolio maintenance was the core of Ms. Njeru's position and in addition, she was due to lead the audit in the upcoming months.

68. Ms. Njeru was understandably shocked by her termination after Zaccaria had previously informed her that she would not be selected for termination and emphasized that the tasks she performed as part of her position were essential to the continued operations of Aon Advantage Funds.

69. Later that week, Ms. Njeru called Zaccaria and asked how she went from being "part of the squad," to being fired.

70. Zaccaria was unwilling to explain, stating "I can't talk about that."

71. Ms. Njeru was unsatisfied with his response, so she pressed forward.

72. Ms. Njeru underscored that even though Aon had eliminated her position, the tasks she performed in her role still needed to be completed because they were necessary requirements, and in some cases, part of Aon's legally binding obligations.

73. Moreover, white male colleagues performing functions which were less essential at the current stage of the business were not fired.

74. Zaccaria continued to be evasive during this conversation, although Zaccaria advised Ms. Njeru that he raised similar arguments during the decision process.

75. The conversation with Zaccaria shifted to the racial and gender composition of the employees selected for termination.

76. During this conversation, Ms. Njeru noted that contrary to Aon's stated principles regarding its commitment to racial, ethnic and gender diversity and inclusion, these principles did not seem to matter after all: five of the six people selected for termination were people of color, both women on the team were terminated, and almost all the people remaining on the team were white men (the remaining team had one non-white man).

77. Zaccaria told her that he had raised the gender and race composition of the group selected for termination and stated that the "the optics are not great."

78. On January 18, Ms. Njeru and Farrar had a phone meeting.

79. During the January 18 call, Ms. Njeru attempted to clarify the facts surrounding her termination.

80. Ms. Njeru told Farrar that on December 14, Zaccaria conveyed to her—unprompted—that she would not be terminated because her job was essential to the ongoing function of Aon Advantage Funds.

81. Farrar responded that he directed Zaccaria to tell Ms. Njeru that her job was safe and that when Zaccaria relayed that information to her it was accurate.

82. When Ms. Njeru pressed Farrar for an explanation as to why the termination criteria had changed, he stated that he was directed to come up with more employees to terminate and indicated that is how Ms. Njeru ended up on the list.

83. Ms. Njeru knew that Farrar's new explanation of events was false because on December 14, Zaccaria told her that he needed to terminate six people, and ultimately six people were terminated from the team.

84. Farrar provided Ms. Njeru with this easily refuted explanation because he was unaware of Zaccaria's December 14 disclosure to Ms. Njeru.

85. As the conversation progressed, Ms. Njeru still had not received a clear response about why she had been terminated despite Zaccaria's earlier disclosure.

86. Ms. Njeru again asked Farrar to provide information about the termination selection criteria.

87. Farrar reiterated that her termination was "not performance driven," and was unwilling to provide a clear explanation and instead cryptically stated that "there wasn't a significance of criteria," regarding termination selection.

88. On January 26, Ms. Njeru's employment termination was effective.

89. Many of the essential tasks that Ms. Njeru performed were assigned to Zaccaria, who did not have experience in the role and struggled to execute the duties.

90. For example, Zaccaria's failure to properly execute the role has led to banks and other institutions contacting Ms. Njeru for essential information about Aon well after her termination became effective.

91. Ms. Njeru's termination was part of a broader pattern of discrimination by Defendants, as evidenced by the fact that five out of six employees terminated at the same time were people of color.

92. Ms. Njeru's duties were taken over by a Zaccaria, a white male who was inexperienced in the role.

93. Both female team members, including Ms. Njeru, were terminated as part of this action, leaving a team predominantly composed of white males.

94. The pretextual nature of Ms. Njeru's termination is further demonstrated by the fact that her essential duties were reassigned to Zaccaria after her departure, establishing that her position remained necessary for Aon's operations.

95. The timing, circumstances, and pattern of terminations clearly demonstrate that Ms. Njeru's race and sex, rather than any legitimate business reason, were the determining factors in Defendants' decision to terminate her employment.

96. As a direct result of Defendants' discriminatory actions, Ms. Njeru has suffered significant financial damages, including but not limited to lost wages, bonuses, and an unvested interest in the Aon IP Advantage Fund Carry Pool Second Vesting Remainder.

97. Beyond financial damages, Ms. Njeru has suffered emotional distress.

**FIRST CAUSE OF ACTION**
**Discrimination in Violation of Section 1981**

98. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

99. Defendants discriminated against Plaintiff on the basis of her race in violation of Section 1981 by denying her the same terms and conditions of employment available to white employees, including, but not limited to: exploiting her image to falsely portray diversity in

13

leadership while denying her actual advancement opportunities; subjecting her to disparate treatment in terms of job responsibilities and advancement opportunities; and terminating her employment while retaining similarly situated white employees.

100. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

101. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe emotional distress for which she is entitled to an award of compensatory damages.

102. Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
### Discrimination in Violation of the NYSHRL

103. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

104. Defendants have discriminated against Plaintiff on the basis of her race and sex in violation of the NYSHRL by denying her the same terms and conditions of employment available to white and male employees, including, but not limited to: exploiting her image to falsely portray diversity in leadership while denying her actual advancement opportunities; subjecting her to disparate treatment in terms of job responsibilities and advancement opportunities; terminating her employment while retaining similarly situated white and male employees; and terminating both female team members and retaining only male employees.

105. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

106. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe emotional distress for which she is entitled to an award of compensatory damages.

107. Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL

108. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

109. Defendants discriminated against Plaintiff on the basis of her race and sex in violation of the NYSHRL by denying her the same terms and conditions of employment available to white and male employees, including, but not limited to: exploiting her image to falsely portray diversity in leadership while denying her actual advancement opportunities; subjecting her to disparate treatment in terms of job responsibilities and advancement opportunities; terminating her employment while retaining similarly situated white and male employees; and terminating both female team members and retaining only male employees.

110. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

111. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe emotional distress for which she is entitled to an award of compensatory damages.

112. Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## DEMAND FOR JURY TRIAL

113. Plaintiff demands a trial by jury for all issues in this action.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Juliet Njeru demands that a judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages;

C. An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D. An award of punitive damages in an amount to be determined at trial;

E. Pre-judgment interest on all amounts due;

F. An award of Plaintiff's reasonable attorneys' fees and costs; and

G. Such other and further relief as the Court may deem just and proper.

Dated: Melville, New York
      January 21, 2025

Respectfully submitted,

By: <u>   /s/ Troy L. Kessler   </u>
      Troy L. Kessler

**KESSLER MATURA P.C.**
Troy L. Kessler
Tana Forrester
534 Broadhollow Road, Suite 275
Melville, New York 11747
(631) 499-9100
tkessler@kesslermatura.com
tforrester@kesslermatura.com

***Attorneys for Plaintiff***